Thomas E. Wheeler (CA Bar #304191)
Environmental Protection Information Center
145 G Street #A
Arcata, CA 95521
Tel: (707) 822-7711
tom@wildcalifornia.org

Sangye Ince-Johannsen, *pro hac vice applicant*
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, Oregon 97401
Tel: (541) 778-6626
sangyeij@westernlaw.org

Peter M. K. Frost, *pro hac vice applicant*
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, Oregon 97401
Tel: (541) 359-3238
frost@westernlaw.org

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENVIRONMENTAL PROTECTION INFORMATION CENTER, | Case No. |
| *Plaintiff*, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| vs. | (Violations of the Endangered Species Act, National Environmental Policy Act, and Administrative Procedure Act) |
| UNITED STATES FISH AND WILDLIFE SERVICE, | |
| *Defendant*. | |

## JURISDICTION

1.      This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 16 U.S.C. §

1540(g)(1)(C). Pursuant to the Endangered Species Act (ESA) citizen suit provision, more than 60

days ago, Plaintiff gave Defendant United States Fish and Wildlife Service (FWS) written notice of

its intent to sue for claims that may be brought under the provision. 16 U.S.C. § 1540(g)(2). FWS has

not remedied its violations of the ESA, which continue.

2.      FWS's decision to approve the application of Sierra Pacific Industries (Sierra Pacific) for an

Incidental Take Permit (ITP) and Habitat Conservation Plan (HCP) is final agency action subject to

judicial review under 5 U.S.C. § 704. FWS's Biological Opinion (BiOp) on its issuance of ITP and its

approval of the HCP is final agency action subject to judicial review under 5 U.S.C. § 704. FWS's

Environmental Impact Statement (EIS) on the ITP and HCP is final agency action subject to judicial

review under 5 U.S.C. § 704.

3.      Plaintiff has suffered legal wrongs and is adversely affected and aggrieved within the

meaning of the ESA and National Environmental Policy Act (NEPA) because of the actions taken

by FWS. 5 U.S.C. § 702. An actual, justiciable controversy exists between Plaintiff and Defendant.

4.      The relief Plaintiff seeks is proper under 16 U.S.C. § 1540(g)(1)(A), 28 U.S.C. §§ 2201 &

2202, and 5 U.S.C. §§ 705 & 706.

## VENUE

5.      Venue in this Court is proper under 28 U.S.C. § 1391(e)(1) and 16 U.S.C. § 1540(g)(3)(A)

because all, or a substantial part, of the events or omissions giving rise to this litigation occurred

within this judicial district. FWS officials who authorized the decisions at issue in this litigation are

headquartered in offices within this judicial district. FWS decisions at issue pertain to privately-

owned lands within this judicial district.

## INTRODUCTION

PAGE 1     COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

6.      This action by the Plaintiff challenges FWS's issuance of a Record of Decision (ROD), EIS, BiOp, ITP and HCP Sierra Pacific, concerning its logging operations on approximately 1.5 million acres in California over 50 years. EPIC asserts violations of the ESA, NEPA, and Administrative Procedure Act (APA). EPIC seeks declaratory and injunctive relief to set aside FWS's decision to issue the permit until these violations of law are remedied.

## PARTIES

7.      Plaintiff ENVIRONMENTAL PROTECTION INFORMATION CENTER (EPIC) is a non-profit corporation headquartered in Arcata, California. Since 1977, EPIC has defended California's wildlife and wild places, including the Klamath Mountains. EPIC's mission is the science-based protection and restoration of northwest California's forests and seeks to ensure that a connected landscape exists for species survival, species recovery, and climate adaptation. For more than 40 years, EPIC has been at the forefront of protecting forests, ensuring that state and federal agencies follow their mandate to uphold environmental laws, and protecting endangered species. Most of EPIC's 15,000 members and supporters live in northern California. Approving the HCP and ITP frustrates EPIC's mission to provide for the recovery and maintenance of complete and functional ecosystems. Moreover, FWS's decision harms EPIC's interests, and interests of its members and staff, in spotted owls and other impacted species and their associated forest habitats.

8.      EPIC's staff and members regularly recreate near areas comprising the Project area covered by the HCP and ITP, including hiking, enjoying nature, attempting to observe wildlife (such as northern spotted owls and California spotted owls), photographing wildlife and forest ecosystems, and otherwise enjoying the aesthetics and scientific bounty of the Project area and immediately surrounding area. The Project Area is adjacent to public lands that EPIC's staff and members recreate on. EPIC's staff and members intend to return to the Project area's vicinity in the future to

recreate and otherwise enjoy the Project area. EPIC's staff and members will likely not return to the Project area if the logging contemplated by the project is implemented.

9.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE (FWS) is an agency within the U.S. Department of the Interior responsible for upholding, enforcing, and implementing the federal laws and regulations challenged in this case. FWS approved the HCP and ITP, the BiOp, and the EIS and ROD, which constitute the four decisions and final agency actions that EPIC challenges.

## FACTS

10.     Sierra Pacific Industries (SPI) is a private landowner in California, where it manages its forestlands for the primary purpose of growing and logging timber.

11.     SPI manages its forestland holdings in California for the primary purpose of commercial timber production.

12.     Some of SPI's forestland holdings provide habitat for northern spotted owls and California spotted owls.

13.     The northern spotted owl (*Strix occidentalis caurina*) and California spotted owl (*Strix occidentalis occidentalis*) are two sub-species of the spotted owl (*Strix occidentalis*).

14.     The northern spotted owl occupies late-successional and old-growth forest habitat. The northern spotted owl may also occupy other mixed-conifer forest habitats. The range of the spotted owl is from southern British Columbia south to Marin County, California.

15.     The California spotted owl occupies late-successional and old-growth forest habitat. The California spotted owl may also occupy other mixed-conifer forest habitats. The range of the California spotted owl spans the Sierra Nevada mountain range, the Transverse and Peninsular mountain ranges, and portions of Baja California Norte, Mexico.

16.     The spotted owl, including both the northern and California spotted owl subspecies, is a small- to medium-sized dark brown owl with a barred tail, white spots on the head and breast, and dark brown eyes surrounded by prominent facial disks.

17.     The spotted owl is one of the most studied birds in the world.

18.     Spotted owls rely on older forest habitats because they generally contain the structures and characteristics required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal. Spotted owls require a multi-layered and multi-species tree canopy dominated by large overstory trees. Spotted owls require moderate to high canopy closure. Spotted owls require a high incidence of trees with large cavities and other types of deformities. Spotted owls require the presence of large snags. Spotted owls require an abundance of large, dead wood on the ground. Spotted owls require open space within and below the upper canopy for owls to fly.

19.     Forested stands with high canopy closure provide spotted owls with thermal cover and protection from predation. This habitat is known as "nesting, roosting, and foraging" ("NRF") habitat.

20.     Spotted owls require habitat to disperse to new territories. Dispersal habitat consists of stands with adequate tree size and canopy closure to provide protection from avian predators and at least minimal foraging opportunities. Dispersal habitat may include younger and less diverse forest stands than foraging habitat. Dispersal habitat may include younger and less diverse forest stands than foraging habitat if such stands contain some roosting structures and features that provide foraging opportunities to allow for temporary resting and feeding for dispersing juvenile owls. Dispersal habitat is essential to maintaining stable spotted owl populations. Dispersal habitat allows spotted owls to recolonize territorial vacancies after resident spotted owls die or leave. Dispersal habitat is necessary for adequate gene flow across the species' range. Successful dispersal is more

likely in mature and old-growth forest stands characteristic of NRF habitat. NRF habitat is where there is more likely to be adequate cover and food supply.

21.    Spotted owl occupancy of a territory is determined based on a series of protocol surveys. The surveys take place over a period of two years.

22.    The probability of spotted owl occupancy is increased when core areas contain a range of habitat conditions suitable for their use. The survival and fitness of spotted owls is positively correlated with larger patch sizes and proportion of older forests. Depending on the availability of habitat, fitness may be compromised when additional habitat losses occur. Habitat-fitness and landscape models show the importance of having sufficient NRF habitat within core use areas to provide for spotted owl survival and reproduction, along with access to prey. Spotted owl survival is negatively correlated with fragmented forests.

23.    Barred owls (*Strix varia*) are native to North America. Barred owls arrived only recently in California. Barred owls are arger and more aggressive than spotted owls. Barred owls and spotted owls compete for the same habitat and prey. Barred owls use a wider range of habitat types than spotted owls. Barred owls prey on a wider range of prey species than spotted owls.

24.    The presence of barred owls is known to suppress spotted owl survey responses. The presence of barred owls may result in false-negative spotted owl survey results.

25.    FWS listed the northern spotted owl as a Threatened species under the ESA on June 26, 1990. FWS listed spotted owls in part due to habitat loss and modification. FWS listed spotted owls in part due to the lack of regulatory mechanisms to protect the species. Due to the same concerns with respect to California spotted owls, FWS proposed for listing as endangered the Sierra Nevada distinct population segment (DPS), and the Coastal-Southern California as threatened, on February 23, 2023. 88 Fed. Reg. 11600 (Feb. 23, 2023).

26.    Researchers have tracked spotted owl demography for decades. Researchers have tracked estimated populations across the range of the species. Since listing under the ESA spotted owl populations continue to decline. In 2016, researchers estimated that the spotted owl population has declined 3.8% per year range-wide. In 2018, researchers estimated that populations in all 11 demography study sites are now declining. In 2018, researchers estimated that populations in all 11 demography study sites are now declining at an accelerated rate.

27.    High value northern spotted owl habitat across the northern spotted owl's range are key requirements of recovery.

28.    Forests in western North America are departed from historical conditions. Past timber harvest has removed large-diameter fire-resilient tree species. Fire suppression since the 20th century has reduced the frequency and extent of low- and mid- severity wildfire. The combined effects of past timber harvest and fire suppression effort include denser stands that are more prone to high-severity wildfire.

29.    Timber harvest that removes all or most of the forest canopy and establishes young, second-growth early seral stands further increases the risk of future wildfire. This increased risk is more pronounced in checkerboard landownership patterns.

30.    Some of SPI's forest holdings mix with United States Forest Service lands in a "checkerboard" ownership pattern.

31.    Global climate change has resulted in and will continue to result in increasingly hot and dry summers, and less snow accumulation during the winters in the region, compared to historical averages. As a result, "fire season" across California has grown longer and more unpredictable.

32.    Spotted owls within the SPI property use both private and federally managed forestland.

33.    Spotted owls within the SPI property use both private and federally managed forestland.

34.     SPI's landholdings include properties in the Klamath Mountains, Southern Cascades, and Sierra Nevada. SPI landholdings include areas occupied by northern spotted owls in the northern portions and California spotted owls in the eastern and southern portions of the area.

35.     SPI's landholdings have been impacted by high-intensity wildfires in the last decade. SPI's landholdings have been impacted by high-severity wildfires in the last decade.

36.     On December 14, 2018, SPI applied for an ITP and submitted a proposed HCP for incidental take of northern and California spotted owls that may result from logging it plans to conduct on 1,565,707 acres of land it owns in California over a 50-year term.

37.     Activities associated with SPI's HCP include growing, logging, and transporting timber; regenerating timber stands; constructing and maintaining roads and landing sites; constructing and maintaining fuel breaks; and monitoring and research for spotted owls.

38.     SPI informed FWS that it would change its land management practices if it were not granted the permits. SPI informed FWS that it would log less or not at all if it were not granted the permits.

39.     On September 25, 2020, FWS transmitted a BiOp on its proposed action to approve Sierra Pacific Industries' HCP and issue the ITP.

40.     In the BiOp, FWS concluded that issuing the ITP was not likely to jeopardize the continued existence of northern spotted owls or California spotted owls, or destroy or adversely modify either species' critical habitat.

41.     In the ITP, FWS authorized incidental take of up to 115 northern spotted owls and 649 California spotted owls.

42.     FWS approved the HCP and granted the ITP on September 30, 2020.

**FIRST CLAIM FOR RELIEF**
**ENDANGERED SPECIES ACT**
**COUNT ONE:**

**The HCP does not minimize and mitigate the impacts of**
**incidental take to the maximum extent practicable.**

43.     EPIC realleges all allegations.

44.     FWS may not approve an HCP or issue an ITP that does not minimize and mitigate the impacts of take to the maximum extent practicable. 16 U.S.C. § 1539(a)(2)(B)(ii).

45.     The first Conservation Measure (CM1) aims to increase aggregations of spotted owl habitat over time. These habitat definitions are inconsistent with the best available science, including information contained in the HCP appendices, because they protect fewer large trees, protect less canopy cover, and overestimate the amount of actual functioning habitat.

46.     The second Conservation Measure (CM2) aims to protect habitat around known activity centers. This measure can be terminated following three consecutive years of surveyed non-occupancy. Basing habitat protections on the results of occupancy surveys alone is contradicted by the best available science. Basing habitat protections on the results of occupancy surveys alone is contradicted by FWS's guidance to CALFIRE that the survey protocol is not appropriate for establishing permanent abandonment of spotted owl sites.

47.     The third Conservation Measure (CM3) aims to retain "green trees" during salvage harvesting to accelerate the development of future habitat for spotted owls in sites that are reforested following salvage logging. However, the HCP does not require the completion of owl surveys or the adoption of avoidance measures if territorial birds occupy an area proposed for salvage logging. This decision is unsupported by the best available science because spotted owls are known to return to areas affected by wildfire and nest in areas even following high severity fire. This use is negatively affected by salvage logging. CM3 is not materially different from SPI's current practices, representing the minimum required under the mandatory California Forest Practice Rules.

48.     The adaptive management framework described in the HCP does not remedy these deficient conservation measures.

49.     FWS's decision to approve the HCP violates the ESA, 16 U.S.C. § 1539(a)(2)(B)(ii).

PAGE 8     COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

50.     FWS's decision to approve the HCP is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A).

## FIRST CLAIM FOR RELIEF
## ENDANGERED SPECIES ACT
## COUNT TWO:

**The BiOp unlawfully relies on conservation measures that are
uncertain to occur or meaningfully address threats to the species.**

51.     EPIC realleges all allegations.

52.     When preparing a BiOp under Section 7(a)(2) of the ESA, FWS may rely on mitigation and conservation measures in determining an action is unlikely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of its critical habitat, only if such measures are reasonably specific, certain to occur, capable of implementation, subject to deadlines or otherwise-enforceable obligations, and address threats to the species in a way that satisfies the 'jeopardy' standard.

53.      In concluding its decision to approve the HCP and issue the ITP to SPI, FWS relied on CM1, CM2, and CM3.

54.     CM1, CM2, and CM3 do not adequately ensure against jeopardy because they do not sufficiently address the relevant threats to the species.

55.     FWS's decision to rely on CM1, CM2, and CM3 in the BiOp violates Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2).

56.     FWS's decision to rely on CM1, CM2, and CM3 in the BiOp is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A).

## FIRST CLAIM FOR RELIEF
## ENDANGERED SPECIES ACT
## COUNT THREE:

**The BiOp issued by FWS is arbitrary and capricious because it fails to consider an
important aspect of the problem and fails to use the best available science.**

57.     EPIC realleges all allegations.

58.     Climate change is projected to increase variability in weather leading to a higher incidence and extent of high-severity wildfire in California.

59.     The even-aged logging regime that SPI intends to apply across its holdings is likely to result in a higher incidence and extent of high-severity wildfire in California.

60.     By the end of the 50-year permit term, approximately 55% of SPI's covered lands are projected to comprise even-aged timber stands.

61.     Increased forest fires resulting from climate change impacts will shift tree species composition and alter forest turnover rates, which will negatively impact spotted owls and their habitat.

62.     The BiOp violates the ESA because it fails to address and analyze climate change impacts on spotted owls and other listed species.

63.     Climate change is mentioned once in the BiOp, in the context of the species' range-wide status. The BiOp does not factor climate change into its analysis.

64.     The BiOp does not consider whether or to what extent the HCP conservation measures' effectiveness may be diminished by climate change impacts.

65.     The BiOp does not consider how climate change impacts might delay, preclude, or alter the species composition of post-logging forest regrowth.

66.     There is readily available scientific data regarding the impacts of climate change on forest fires, forest growth, and spotted owl habitat, which the BiOp failed to include or discuss.

67.     The BiOp fails to address the best available scientific data and provide a rational basis for deciding that the proposed action may affect, but is not likely to adversely affect, spotted owls.

68.     In failing to consider the impacts of climate change on spotted owls in arriving at the not likely to adversely affect conclusion, FWS ignored available science on climate change.

PAGE 10   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

69.     FWS's failure to discuss climate change impacts relating to the Project violates FWS's substantive duty under the ESA to insure the SPI Project will not jeopardize the continued existence of the northern spotted owl and other listed species, or result in the destruction or adverse modification of its critical habitat. 16 U.S.C. § 1536(a)(2).

70.     FWS's failure to discuss climate change impacts relating to the Project is arbitrary and capricious, and not in accordance with law, 5 U.S.C. § 706(2)(A).

## FIRST CLAIM FOR RELIEF
## ENDANGERED SPECIES ACT
## COUNT FOUR:

### The BiOp relies on an unlawful 'take' surrogate.

71.     EPIC realleges all allegations.

72.     The BiOp relies on Potential Habitat Areas (PHAs) as a surrogate to determine whether incidental take has occurred. Under this approach, one instance of take occurs if

(a) harvest occurred in a hexagon in a five-year period that was known to be occupied by spotted owls at the baseline modeling date at the outset of that period, and

(b) either the harvest caused the hexagon to drop Below Threshold, or the harvest occurred in a hexagon that was already Below Threshold at the beginning of the period.

73.     Once covered activities within a given hexagon lead to a take determination, no further take determinations will be made in that hexagon for five years. As the BiOp recognizes, "[t]he biological reality of this accounting method means that in some cases, multiple entries for harvest could occur in an occupied hexagon for up to five years in a row, . . . impact[ing] reproduction in consecutive years rather than only once as was modeled."

74.     The incidental take statement does not account for essential spotted owl habitat and life history requirements. The incidental take statement does not account for survival, fecundity, nesting

success or failure, fledgling success or failure. The incidental take statement does not account for take that may result from post-fire green tree salvage logging.

75.     The incidental take statement allows spotted owl occupancy to be inferred from survey responses. The presence of spotted owls inhibits spotted owl survey responses. Surveys alone are an unreliable method for inferring spotted owl presence and occupancy at a historic site.

76.     The underlying modeling data on which determinations of incidental take will ultimately be based is refreshed only every five years. In recent years, the frequency of high-intensity and high-severity fires has increased. Over the Project area, it is likely that fires will cause habitat conditions in a PHA to fall below the thresholds for occupancy and use, such that any logging should trigger take before the modeling data is updated.

77.     FWS's adoption of PHA thresholds as a surrogate measure of incidental take violates the Endangered Species Act and its implementing regulations. 16 U.S.C. § 1536(b)(4), 50 C.F.R. § 402.14(i)(1)(i).

## SECOND CLAIM FOR RELIEF
## NATIONAL ENVIRONMENTAL POLICY ACT

### The EIS unlawfully defines the no-action alternative.

78.     When preparing an EIS, an agency must evaluate a "no action" alternative (i.e., the effect of not acting). The no-action alternative functions as the baseline against which the effects of action alternatives are measured. 40 C.F.R. § 1502.14(d)).

79.     No-action alternatives violate NEPA when they assume the existence of the proposed project or action. "Where a choice of 'no action' by the agency would result in predictable actions by others, this consequence of the 'no action' alternative should be included in the analysis." CEQ's Forty Most Asked Questions about NEPA, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981).

80.     In the EIS, FWS properly defines the no-action alternative as not issuing the ITP.

PAGE 12   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

81.     In the EIS, FWS assumes SPI would continue logging its landholdings without an ITP, even though doing so would result in take of up to 115 northern spotted owls and 649 California spotted owls.

82.     In the EIS, FWS assumes that SPI would forego the conservation measures set forth in the HCP that SPI is not already bound to follow under California state law, such that FWS deems the proposed action more environmentally protective than taking no action at all. In the EIS, FWS does not account for the predictable actions of SPI to avoid incurring Section 9 'take' liability. In the EIS, FWS does not account for the predictable consequences of such actions, including tree regrowth and recruitment of new spotted owl habitat.

83.     FWS's definition of the no-action alternative in the EIS violates NEPA and its implementing regulations. 42 U.S.C. § 4332(c)(3); 40 C.F.R. § 1502.14(d).

84.     FWS's definition of the no-action alternative in the EIS is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

Based upon the foregoing, EPIC respectfully requests that the Court:

1.     Declare that FWS violated the ESA by relying on improper conservation measures in the BiOp and HCP;

2.     Declare that FWS violated the ESA by failing to analyze adverse effects in the jeopardy analysis;

3.     Declare that FWS violated the ESA by relying on an illegal definition of "take" in the BiOp, HCP, and ITP;

4.     Declare that FWS violated the ESA by failing to consider an important aspect of the problem;

5.     Declare that FWS violated the ESA by failing to use the best available science;

6.      Declare that FWS violated the National Environmental Policy Act by wrongly defining the "no action" alternative;

7.      Set aside the ROD, EIS, BiOp, ITP, and HCP Findings & Recommendations unless and until the Court finds that FWS has complied with the law;

8.      Enjoin FWS and its contractors, assigns, and other agents from proceeding with implementing the ITP and HCP unless and until the violations of federal law set forth herein have been corrected; and

9.      Grant EPIC such other and further relief as the Court deems just and equitable.


Date: November 8, 2023.                          Respectfully submitted,


/s/ Thomas E. Wheeler
Thomas E. Wheeler (he/him), CA Bar #304191
Environmental Protection Information Center
145 G Street, Suite A.
Arcata, California 95521
Tel: (707) 822-7711
tom@wildcalifornia.org

/s/ Sangye Ince-Johannsen
Sangye Ince-Johannsen (he/him)
Western Environmental Law Center
120 Shelton McMurphey Blvd., Ste. 340
Eugene, Oregon 97401
Tel: 541-778-6626
sangyeij@westernlaw.org
*Pro hac vice applicant*

/s/ Peter M. K. Frost
Peter M. K. Frost
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, Oregon 97401
Tel: (541) 359-3238
frost@westernlaw.org
*Pro hac vice applicant*

*Counsel for Plaintiffs*


PAGE 14   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF